# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| UNITED STATES OF AMERICA, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) Case No. 18-CR-131-CVE |
| SHAWN GRANTHAM, | ) |
| Defendant. | ) |

## OPINION AND ORDER

Now before the Court is defendant's Motion to Suppress (Dkt. # 14). Defendant is charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Dkt. # 2). Defendant has filed a motion to suppress (Dkt. # 14) challenging the search of his home and his subsequent arrest. Plaintiff has filed a response arguing that police lawfully entered defendant's property by walking up the driveway, and they were justified by exigent circumstances to order defendant to exit an open garage. Plaintiff further argues that defendant and his mother voluntarily consented to a search of the home (Dkt. # 15). On September 6, 2018, the Court held an evidentiary hearing on defendant's motion to suppress. Plaintiff elicited the testimony of Special Agents Ryan Hensley and Ricky Rushing of the Oklahoma Department of Agriculture, Food, and Forestry (ODA). Defendant called his mother, Willie Hemphill, as a witness. Plaintiff introduced two photographs and an audiorecording of a conversation between Hensley and Hemphill as evidence. Defendant's exhibits consist of five photographs of the house and an attached garage.

## I.

On February 15, 2018, agents of the ODA arrested Freddie Gaskey for stealing a feed truck in Atoka, Oklahoma. The arrest involved an armed stand-off with Gaskey, and agents believed that a .22 caliber rifle had been stolen from the feed truck. On March 6, 2018, agents of the ODA interviewed Gaskey, and Gaskey claimed that a person identified as "Shawn" was holding the rifle for him. Shawn lived near Jennings, Oklahoma, and Gaskey claimed that Shawn helped him hide the stolen feed truck. Hensley pulled up Google Maps on his cell phone and asked Gaskey to identify the house, and Gaskey located Shawn's house on a map.

After the interview, Special Agent Jason Smith of the ODA, Hensley, and Rushing drove to the house identified by Gaskey as Shawn's house, and each agent drove a separate vehicle. Hensley testified that there was little preparation before they went to the house, and the purpose of the trip was to talk to Shawn and "get this gun." The agents observed a semi-circular driveway in front of the house, and a pickup truck was parked in front of the house. The agents parked their cars on or near the driveway on the north side of the property and they walked up the driveway toward the house.[1] Rushing testified that the agents made a tactical decision to park on the north side of the property so they could not be observed from the front door as they approached the house. There was an entrance to the driveway on the east side of the property, and this entrance was visible from the front door and provided a shorter walk to the house. The agents were wearing plain clothes. Rushing testified that the other agents had their badges visible on their clothing, and Rushing opened his jacket to display his badge when he made contact with defendant. The house has an attached garage and the garage door was open when the agents arrived. Hensley was walking somewhat in

---

[1] The parties have submitted as evidence pictures of different views of the house. Plaintiff's exhibits 1 and 2 show aerial views of the house, and defendant's exhibits 1 and 2 show closer views of the home from the position of a person approaching the house on foot.

2

front of the other agents as they approached the house. Hensley observed a person working on a motorcycle in the garage, and he assumed that the person was Shawn. The person that Hensley observed was in fact Shawn Grantham. Hensley testified that the person walked from the garage to an interior room, and Hensley claims that he heard the sound of a firearm chambering a bullet while Grantham was in the house. Hensley testified that Grantham partially exited the interior door but would not show agents the right side of his body. Hensley states that he called out "gun" and began issuing commands to defendant to show both of his hands. He claims that he was attempting to talk Shawn down and he assumed that Shawn was armed. Hensley testified that Grantham came out of the house and exited the garage, and Grantham allowed the officers to frisk him for weapons. Grantham was wearing an empty shoulder holster but no weapons were found on his person.

Rushing's testimony was consistent with Hensley's testimony as to defendant's posture in the doorway, but Rushing's testimony departs from Hensley's in certain aspects. Rushing testified that he was walking through the grass and he was trailing the other agents, and he arrived at the garage after Hensley made contact with Grantham. Hensley was issuing commands for Grantham to come out of the garage and speak to Hensley, but Hensley had not indicated to other agents that there was any reason to believe that Grantham was armed. Grantham clearly stated that he did not wish to speak to the agents. After a short time, Hensley advised the other agents that he heard a "slide," or the sound of a firearm chambering a bullet, and Rushing drew his firearm. Rushing's firearm was held in front of him and not pointed directly at defendant. Half of Grantham's body was visible to agents at all times that Rushing observed Grantham, but Grantham would not fully step out of the doorway to the house. Grantham briefly stepped back in the house and came out showing

3

both of his hands to the agents. Grantham approached the agents and he was patted down for weapons, and he was placed in handcuffs.

Rushing testified that the agents inquired about the shoulder holster that Grantham was wearing, but he refused to answer questions about the holster. Rushing did not issue a Miranda[2] warning to Grantham at any point, and Hensley did not testify that he gave Grantham a Miranda warning. Hemphill came out of the house while the agents were questioning Grantham, and Hensley testified that he informed her that the agents were at the house in reference to a stolen .22 caliber rifle. Hensley claims that Hemphill volunteered to take him into the house. Hensley testified that Grantham was present when Hemphill allegedly consented to take Hensley into the house, but Hensley did not ask for Grantham's consent to enter the house. Rushing's testimony suggests that Grantham's girlfriend, Jessica Jordan, came out of the house as well and that the agents were speaking to her. Rushing testified that he moved Grantham to his vehicle, because the scene was becoming noisy with the agents simultaneously speaking to defendant, Hemphill, and Jordan. Rushing questioned Grantham about the stolen .22 caliber rifle, and Grantham denied that he had the rifle. Rushing also inquired if defendant was a convicted felon, and Rushing asked about the presence of other firearms in the house. Grantham stated that there were firearms in the room from which he stepped into the garage. Rushing requested consent to search that room, which defendant gave, but there is no testimony or evidence that Grantham consented to a search of any other part of the house. Rushing testified that Grantham was not handcuffed and he was not under arrest during this interrogation. However, neither Hensley nor Rushing testified that defendant was asked if he would voluntarily agree to speak to Rushing about the stolen firearm or any other matter.

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

Hensley testified that he followed Hemphill into the house. Hensley and Hemphill proceeded through the living room and into the breezeway leading into the garage, and Hensley observed firearms in a rack on the wall of the breezeway. Hensley testified that he did not immediately seize the firearms. Hemphill also advised Hensley that she had a firearm in a safe in a bedroom. Rushing brought defendant back to the garage after Grantham consented to a search of the garage room, but Hensley was already inside the house with Hemphill. There is no testimony or evidence that the agents requested Grantham's consent for a search of any place other than the garage room. Rushing's testimony also establishes that the agents were aware of the presence of Jordan, and there is no evidence that the agents requested her consent to enter the house. Hemphill signed a written consent form after Hensley had already searched the house. Hensley had a conversation with Hemphill in his car as the consent form was completed. The Court has reviewed the audiorecording of the conversation, and Hensley's tone of voice was not threatening.[3] However, Hemphill clearly provided notice to Hensley that she was not the only adult resident of the house.

Rushing had discovered that there was an outstanding warrant for Grantham's arrest in Pawnee County, and he made this discovery while other agents were searching the house. Rushing placed Grantham under arrest and Grantham was later placed in the custody of the Pawnee County Sheriff's Office when deputies arrived on the scene.

Hemphill testified at the suppression hearing, and she offered a different version of the events of March 6, 2018. She testified that she was watching television when she saw a person walk

---

[3] It is clear from the audio recording that Hensley believed that Grantham delivered a firearm to Jordan before he exited the garage, and Rushing's testimony suggests that the agents all shared a similar belief. However, plaintiff has offered no evidence that the agents recovered a chamber-loaded pistol from the house.

past a window near the front door of the house. She went outside as the agents initially made contact with Grantham, and she recalls that Grantham and the agents were yelling. The agents advised her that there were at the house to search for a stolen firearm and they told her to go back into the house. Hemphill went back in the house, and she went to a patio door where she could view Grantham speaking to the agents. Hemphill states that the agents were ordering Grantham to put down his gun, and he denied that he had a gun. Hemphill testified that she went out the front door again, and one of the agents was speaking to Jordan in the garage. Hemphill spoke to one of the agents and returned to the house, and an agent entered the house from the interior garage door. The agent asked about firearms that hanging on the wall, and Hemphill stated that the firearms belonged to her. Hemphill also advised the agent, Smith, that she had .45 pistol in her grandson's room, and she took Smith to the pistol. The pistol was not chamber-loaded. Smith remained in the home and she claims that Smith ran background checks on her and Jordan. Hemphill testified about the consent form she signed in Hensley's vehicle, and she claims that the firearms had already been seized when she asked to sign the form.

## II.

Defendant has filed a motion to suppress challenging the search of the house, and he asks the Court to suppress any evidence seized from the house and any statements made by any resident of the house during the events on March 6, 2018. Plaintiff argues that the agents were required to remove defendant from the garage for officer safety, and they subsequently obtained Grantham's and Hemphill's request to search the house.

<u>Agents' Entry onto the Property</u>

6

Defendant argues that the agents violated his rights under the Fourth Amendment by entering the curtilage of his home without a warrant. Plaintiff responds that the agents followed the normal route of access to the front door of the home, and they were permitted to make observations of the home as they approached the front door.

The Fourth Amendment ordinarily prohibits the warrantless search of a person's home as per se unreasonable. Georgia v. Randolph, 547 U.S. 103, 106 (2006); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Police face a higher burden when entering a person's home, because "[f]reedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." Payton v. New York, 445 U.S. 573, 587 (1980). Police can enter a person's home with consent, even if probable cause does not exist, provided that the consent is "freely and voluntarily" given. United States v. Cruz-Mendez, 467 F.3d 1260, 1265 (10th Cir. 2006). The mere fact that police approached defendant's home to initiate the encounter does not create an inference that defendant's consent was obtained through coercion. United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005).

Curtilage is the "land immediately surrounding and associated with the home" and the Fourth Amendment protections applicable to the home also extend to the curtilage surrounding the home. United States v. Shuck, 713 F.3d 563, 567 (10th Cir. 2013). The Tenth Circuit has provided a four factor test to determine if an area should be treated as curtilage for Fourth Amendment purposes: "(1) the proximity of the area to the house; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the use to which the area is put; and (4) the steps taken by the resident to protect the area from observation." United States v. Cousins, 455 F.3d 1116, 1122 (10th Cir. 2006). Warrantless entry into the curtilage of a home is permitted if there are exigent

circumstances or the homeowner has consented to the entry. Id. Police may also approach a residence using the "normal route of access," including through the curtilage, if this is the way any other person would use to visit the residence. Shuck, 568 F.3d at 567-68. Police are not required to "shield their eyes" when they approach a residence, but they must make observations in a "physically nonintrusive manner." Florida v. Jardines, 133 S. Ct. 1409, 1415 (2013).

The parties have provided photographs of the residence, and there is no dispute that a person attempting to approach the front door would have to walk up or park on the driveway. However, defendant argues that the agents specifically parked on the north side of the house to approach the house without being observed from the front door, and they had no lawful right to be in a position where they could have seen into the garage. Hensley testified that a pickup truck was parked in front of the house, and he drove to the driveway entrance on the north side of the house. Rushing testified that he would have parked on the north side of the house, regardless of the pickup truck, because he perceived a tactical advantage from approaching the house unobserved from the front door. The aerial photograph of the house shows that there is a driveway on the east side of the house that leads up to the front door, and this is the shortest path to the front door.

The law is clearly established that police may approach a home to knock on the front door for the purpose of speaking to occupants. United States v. Carloss, 818 F.3d 988, 992 (10th Cir. 2016). The issue in this case is whether the agents used the normal route of access when approaching the front door of the home. Rushing's testimony calls into question whether the agents purposefully parked on the north side of the property in order to evade notice by the occupants of the home. However, it is not disputed that Hemphill's pickup truck was parked in front of the home, and this could have cause the agents to believe that there was not sufficient space to park three

8

vehicles on driveway on the east side of the house. Under the circumstances, the Court does not find that it was unreasonable for the agents to park on the north side of the property, and walking toward the house on the driveway did not invade the curtilage of the home.[4] However, the Court will consider Rushing's testimony that the agents made a tactical decision to approach the property in a manner intended to avoid observation from front door as a factor in evaluating other Fourth Amendment issues.

Agents' Contact with Defendant

Defendant argues that he was unlawfully seized when Hensley initially ordered him to leave the garage, and he claims that he had not re-entered the garage in any fashion before agents commanded him to exit the interior door. Dkt. # 14, at 6. Plaintiff responds that the agents acted out of a concern for officer safety by ordering defendant to exit the garage, and they did not unlawfully seize defendant by conducting a pat down to search for weapons.

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." U.S. CONST. amend. IV. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio, 392 U.S. 1, 16 (1968). "Reasonableness under the Fourth Amendment 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" United States v. King, 990 F.2d 1552, 1559 (10th Cir. 1993) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)). In balancing these interests, the

---

[4] Rushing's testimony suggests that he may have left the driveway and walked on the grass. Defendant does not specifically challenge the search because of Rushing's conduct in this regard, and the Court finds that it is unnecessary to resolve whether walking in the grass near the garage constituted an invasion of the curtilage.

9

Supreme Court has held that arrests, being the most intrusive of Fourth Amendment seizures, are reasonable only if supported by probable cause. Novitsky v. City of Aurora, 491 F.3d 1244, 1253 (10th Cir. 2007); United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996). Investigative detentions, which are Fourth Amendment seizures of limited scope and duration, are lawful if they are supported by a reasonable suspicion that the detained individual is engaged in criminal activity. Novitsky, 491 F.3d at 1253. The investigative detention must be "justified at its inception and reasonably limited in scope." United States v. Rice, 483 F.3d 1079, 1082 (10th Cir. 2007). The Tenth Circuit has made a clear distinction between the level of suspicion needed to initiate an arrest and an investigative detention:

> While an investigative detention is a seizure within the meaning of the Fourth Amendment, it need not be supported by probable cause. An investigative detention is justified where specific and articulable facts and rational inferences from those facts give rise to reasonable suspicion that a person has committed or is committing a crime.

United States v. Walraven, 892 F.2d 972, 975 (10th Cir. 1989) (quoting United States v. Espinosa, 782 F.2d 888, 890 (10th Cir. 1986)).

An investigative detention may be "transformed" into an arrest under the Fourth Amendment under certain circumstances. United States v. Hamilton, 587 F.3d 1199, 1215 (10th Cir. 2009). "[I]f police officers' actions exceed what is reasonably necessary under the totality of the circumstances, the stop may only be justified by probable cause or consent." United States v. Melendez-Garcia, 28 F.3d 1046, 1051 (10th Cir. 1994). This may occur due to the use of handcuffs, firearms, or other police techniques inconsistent with the limited scope of an investigation detention, or the detention may become so lengthy that the investigation detention escalates into a de facto arrest. United States v. White, 584 F.3d 935, 952-53 (10th Cir. 2009). "An officer has probable cause to arrest if, under

10

the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1227 (10th Cir. 2008) (quoting United States v. Munoz-Nava, 524 F.3d 1137, 1144 (10th Cir. 2008)).

Plaintiff argues that defendant was not seized in any manner until he voluntarily left the garage, and there was no investigative detention or arrest under the Fourth Amendment. Defendant argues that the agents issued commands to him while he was in his house, and he claims that he was forcibly removed from his home by a display of force from the agents. Hensley's and Rushing's testimony differed on a critical point related to the removal of defendant from the home. Hensley testified that he saw a person in the garage as he approached the house, and the person entered the house through an interior door. Hensley testified that he called out to the person and said that he wanted to talk, and Hensley claims that it was at this point in the encounter that he heard the sound a firearm chambering a bullet. Hensley testified that defendant stepped into the doorway and showed only half of his body to the agents, and it was at this point that Hensley began issuing commands for defendant to exit the garage for officer safety. Rushing testified that Hensley was already issuing commands for defendant to exit the garage by the time that Rushing reached the garage, but Hensley had not advised the other agents that he had heard the slide of a firearm chambering a bullet. Defendant stepped into the doorway and argued with the agents, and he briefly went into the house before exiting the garage. Defendant was frisked for weapons and subsequently interrogated in Rushing's vehicle, but neither Rushing or Hensley testified that defendant consented to answer questions about any matter.

The Court finds that Rushing's testimony is more credible as to the sequence of events leading up to the removal of defendant from his garage. Rushing displayed a clearer recollection of the events and he was unequivocal that Hensley was commanding defendant to leave the house before there was any basis believe that defendant could be armed. Defense counsel also questioned Hensley about several inconsistencies between his report and his testimony, and it does not appear that Hensley clearly recalls the events of March 6, 2018. The Court credits Rushing's testimony that defendant had gone inside the house and that Hensley was issuing commands to defendant before there was any basis to believe that defendant could be armed. The testimony of Hensley and Rushing was in agreement that the agents went to the house to engage in a "knock and talk," and the mere presence of the agents on defendant's property was not a constitutional violation. See United States v. Carloss, 818 F.3d 988, 992 (10th Cir. 2016). However, the Tenth Circuit has been clear that the "home's occupant remains free to terminate the conversation or even to avoid it altogether by not opening the door." Id. at 992. Rushing's testimony shows that defendant had closed the door to his house and he gave no indication that he wished to speak to the agents. At that point in the encounter, the agents could have continued toward the front door to determine if anyone else was home who wished to speak to them, or they could have left the property and attempted to obtain a search warrant. Defendant had no obligation to comply with Hensley's commands to speak to the agents about a stolen firearm, and Hensley's commands to defendant went beyond what was permissible in a knock and talk.

The Court finds that the March 6, 2018 encounter was carried out in a manner more consistent with an arrest, rather than a knock and talk. The encounter began when the agents entered the property with the intention of somewhat disguising their approach to the house to gain a tactical

12

advantage. Hensley made contact with defendant and asked to speak to him, but defendant went into the house and impliedly exercised his right to decline to speak to the agents. Defendant exited the garage after the agents drew their weapons based upon Hensley's statement that defendant was armed, and he was frisked for weapons after leaving the garage. At this point, the agents could have continued with a consent encounter and asked defendant if he voluntarily wished to speak to them about the stolen firearm. Instead, Rushing took defendant to his vehicle and questioned defendant about the stolen firearm. Rushing did not give defendant a Miranda warning. There is no reasonable basis to view this encounter as a knock and talk.

Exigent Circumstances

Plaintiff argues that the agents were justified by exigent circumstances to draw their firearms and command defendant to exit the garage, because Hensley believed that defendant was armed and there was a concern for officer safety. Defendant responds that the agents created any exigent circumstances by exceeding the permissible scope of the knock and talk, and he argues that was illegally seized from the home.

The Supreme Court has stated that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (quoting Mincey v. Arizona, 437 U.S. 385, 392 (1978)). The Tenth Circuit follows a two-part test to determine if "the risk of personal danger created exigent circumstances: . . . whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and [whether] (2) the manner and scope . . . [of the officers' actions] is reasonable." United States v. Najar, 451 F.3d 710, 718 (10th Cir. 2006). A court considering whether exigent circumstances existed must examine the "realities of the

13

situation presented by the record from the viewpoint of prudent, cautious, and trained officers." United States v. Gambino-Zavala, 539 F.3d 1221, 1225 (10th Cir. 2008). "The existence of exigent circumstances is a mixed question of law and fact." United States v. Martinez, 643 F.3d 1292, 1296 (10th Cir. 2011) (quoting United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992)). In Kentucky v. King, 563 U.S. 452 (2011), the Supreme Court explained when the exigent circumstances doctrine applies in the context of a knock and talk. Law enforcement officers who merely knock on the front door and ask to speak to the occupant are doing no more than any private citizen might do, but the occupant has no obligation to speak to police or even open the door. Id. at 469. In order for exigent circumstances to justify entry into the home, there must be no actual or threatened violation of the Fourth Amendment preceding the entry into the home. Id.

Plaintiff bears the burden to show that exigent circumstances existed, and the Court must also consider whether the agents created a situation that was susceptible to abuse or manipulation in order to unlawfully gain entry into the home. United States v. Aquino, 836 F.2d 1268, 1272 (10th Cir. 1988). In this case, the Court has determined that Hensley exceeded the permissible scope of a knock and talk by commanding defendant to leave the home, and it was only after this point in the encounter that Henlsey claims that he heard the slide of a firearm. Defendant initially had no obligation to speak to the agents or comply with Hensley's commands. Instead of approaching the front door or leaving the property, Hensley continued to issue commands to defendant and then claimed that he heard a sound that could be defendant loading a bullet into a firearm. There was no immediate need for the agents to draw their firearms when the agents initially made contact with defendant, and the need only arose after Hensley unlawfully commanded defendant to come and speak to him. The Court does not find that plaintiff has met its burden to show that any exigency

14

existed when the agents initially made contact with defendant that warranted the use of firearms and his removal from the garage. Instead, Hensley's decision to unlawfully command defendant to exit the garage gave rise to a situation in which he believed that defendant was armed, and the Court does not find that this is the type of situation that would warrant application of the exigent circumstances doctrine.

Consent of All Residents of the Home

Plaintiff argues defendant and Hemphill consented to a search of the home, and the agents could lawfully search the home without obtaining a warrant. Defendant argues that neither he nor Hemphill voluntarily gave their consent allowing the agents to search the home, and any consent was tainted by the unlawful seizure of defendant.

Although not raised by the parties, there were three residents of the home who were physically present on March 6, 2018, and it is unclear if and when they each consented to a search of the home. In Georgia v. Randolph, 547 U.S. 103 (2006), the Supreme Court considered whether police could lawfully perform a consent search of a home when one of the physically present occupants of the home refused to consent to the search. The case arose when police responded to a domestic dispute call involving a husband and wife, and both husband and wife were present in the marital home when the police arrived. Id. at 107. The wife advised the police that her husband was a drug user and there were "items of drug evidence" in the home, and she consented to a search of the home. Id. However, her husband unequivocally refused to consent to the search. Id. The police officer entered the home and the wife took the police officer to a bedroom to show him what appeared to be cocaine. Id. The husband was arrested, and he moved to suppress evidence seized during the warrantless search of his home. Id. The Supreme Court explained that it was seeking to

15

a resolve a circuit split concerning "the reasonableness of police entry in reliance on consent by one occupant subject to immediate challenge by another . . . ." Id. at 113. In such cases, the consent of one occupant is not sufficient to allow police to make a warrantless entry into a home when another physically present occupant refuses to consent, but police can use information provided by the consenting occupant to obtain a search warrant. Id. at 116-17. The Supreme Court made clear that it was drawing a "fine line" and it distinguished the facts in Randolph from a situation when an occupant of the home is not present when consent to search is requested:

> if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.

Id. at 121. In a subsequent decision, the Supreme Court explained that "the Court's opinion [in Randolph] went to great lengths to make clear that its holding was limited to situations in which the objecting occupant is present." Fernandez v. California, 571 U.S. 292, 301 (2014).

In this case, there were three adult residents of the home and there is no dispute that each of the residents was physically present when the home was searched. The Court will assume that Hemphill voluntarily consented to a search of the home, but Hemphill's consent was not by itself sufficient to allow the agents to make a warrantless entry into the home.[5] Rushing's testimony establishes that defendant did eventually consent to a search of the room off the garage, but there is no evidence that defendant consented to a search of any other part of the home. However, he

---

5   Plaintiff argues that Hemphill signed a written consent form and she made no attempt to withdraw her consent. It is unclear what value the written consent form could have, because there is no dispute that the agents had already searched the home when she signed the written consent form. She also testified that they had already removed the firearms from the home when she was presented with the consent form.

consented after he had been illegally removed from his home and after he was questioned by Rushing without receiving a Miranda warning. Even if defendant's consent was valid, Rushing testified that Hensley was already in the home before he returned to the garage with defendant, and a violation of Randolph had already occurred. In addition, Rushing testified that defendant's girlfriend, Jordan, was also present when the home was searched, and there is no evidence that any of the agents even asked for her consent. Under Randolph, the agents were required to obtain the consent of each person that was physically present who had authority to consent to a search of the home, and the testimony of Hensley and Rushing is in agreement that Hensley entered the home based only on Hemphill's consent. The Court finds that it is unnecessary to consider other arguments raised by defendant related to a consent search of the home, because the testimony presented at the suppression hearing establishes a clear violation of Randolph.

## III.

The Court finds that defendant's motion to suppress (Dkt. # 14) should be granted. Agents of the ODA were permitted to approach the house to engage in a knock and talk, but the encounter quickly escalated due to Hensley's unlawful commands that defendant come out of the house. At that point in the encounter, defendant had the right to remain in his home and not speak to the agents. Even assuming that Hensley heard the sound of defendant loading a firearm, this would have given the agents a limited right to ensure the safety of themselves and others. Instead, the agents exploited the situation and gained access to the home based on one full and one partial consent of two of the three adult occupants of the home. Defendant's rights under the Fourth Amendment were

17

violated by his seizure and subsequent search of the home, and any evidence found as a result of the constitutional violations should be suppressed.[6]

**IT IS THEREFORE ORDERED** that defendant's Motion to Suppress (Dkt. # 14) is **granted**.

**DATED** this 11th day of September, 2018.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

---

[6] Defendant and his mother are now on notice that defendant may not live in a home with any firearms.